Edward Hernstadt (EH-9569)
Lia N. Brooks (LB-0618)
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue
New York, New York 10022
(212) 826-5582
*Attorneys for Dianne Rochenski*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
DIANNE ROCHENSKI,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiff,　　　　　　　　:　　　07 Civ.　 ( ) ( )
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　- against -　　　　　　　　　　　:　　　**COMPLAINT**
　　　　　　　　　　　　　　　　　　　　　　　　　:
MANHATTAN MOTORCARS, INC. and EVAN　:　　　**PLAINTIFF DEMANDS**
CHRISTODOULOU,　　　　　　　　　　　　　　:　　　**A TRIAL BY JURY**
　　　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendants.　　　　　　　:
------------------------------------------------X

　　　　Plaintiff Dianne Rochenski ("Dianne" or "Plaintiff"), by her attorneys, Frankfurt Kurnit Klein & Selz, PC, for her complaint against defendants Manhattan Motorcars, Inc., ("MMI" or the "Dealership") and Evan Christodoulou ("Christodoulou"), alleges as follows:

### NATURE OF THE ACTION

　　　　1.　　This action is brought to remedy discrimination on the basis of gender in the terms, conditions and privileges of employment, and to remedy retaliation for opposition to unlawful employment actions, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Administrative Code of the City of New York § 8-107 *et seq.* (the "City Law").

　　　　2.　　Plaintiff is a woman who was subjected to a shocking and persistent pattern of sexual harassment and assault by her supervisor. The unwanted conduct imposed on Plaintiff by Christodoulou was severe and pervasive, and caused her extreme mental anguish and harm. When

FKKS 324275 v.4　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　16555.200

she complained about the hostile work environment in which she was being forced to work, defendants retaliated against her, and she was ultimately constructively discharged.

## JURISDICTION AND VENUE

3. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 160-2006-00226, on or about August 16, 2005, complaining of the acts of gender discrimination and retaliation alleged herein. Plaintiff has filed the instant action within 90 days from receipt of the Notice of Right to Sue issued by the EEOC on or about March 8, 2007.

4. Pursuant to the City Law, Plaintiff has served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

5. Jurisdiction of this Court is proper under 29 U.S.C. § 626(c) and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the City Law claims pursuant to 28 U.S.C. § 1367.

6. MMI maintains its principal office, in which Christodoulou and Plaintiff were based and in which most of the unlawful practices complained of herein occurred, in the Southern District of New York. Accordingly, venue is proper within this District.

## PARTIES

7. Plaintiff was employed at MMI as a receptionist from October 2004 until her constructive termination on or about February 14, 2005.

8. Defendant MMI, an automobile dealership selling a variety of expensive luxury cars, is, upon information and belief, a corporation organized under the laws of the State of New York, whose principal place of business is 270 11th Avenue, New York, New York, 10001. Upon information and belief, it is an employer within the meaning of Title VII and the City Law.

9.  Defendant Christodoulou is an individual who was, at all times relevant to this complaint, employed by the Dealership in New York, New York, was Plaintiff's supervisor, in which capacity he had daily contact with Plaintiff, and actively, willfully and knowingly engaged in illegal conduct with respect to her.

## FACTUAL ALLEGATIONS

### Working Conditions at the Dealership

10.  Dianne was employed as a receptionist at MMI from October 2004 through February 14, 2005, when she was constructively discharged from her employment as a result of Christodoulou's outrageous and egregious conduct. At all relevant times, Dianne was qualified for her position with the Dealership and performed her job duties in a satisfactory manner.

11.  When Dianne was hired, she was not then or ever issued an employee handbook or any written employment or EEO policy or procedure. She was not then or ever informed of any Dealership EEO policy or procedure regarding workplace sexual harassment or the filing of any complaints alleging the existence of such harassment.

12.  During the entire course of her employment, Dianne was directly supervised by Christodoulou, who was the Dealership's Sales Director specializing in some of the Dealership's most expensive and profitable luxury automobiles. From the beginning of her employment at the Dealership, Christodoulou repeatedly subjected Dianne to unwanted sexual conduct, unwanted sexual comments and unwanted sexual advances. For example, on one occasion, Christodoulou pulled up Dianne's skirt and said "let me see your pussy." Another time, when Dianne went to the restroom, Christodoulou said "let me come in with you and watch."

13.  Additionally, on several occasions, Christodoulou inflicted Dianne with unwelcome and graphic descriptions of sexual activity in which he had engaged, including

incidents where Christodoulou claimed to have brought home other women to have sex with him and his girlfriend.

14. Christodoulou constantly badgered Dianne to go out on dates with him, which Dianne repeatedly refused.

15. Most disturbingly, Christodoulou also physically and sexually assaulted Dianne. On several occasions, he attempted to grab her breasts. He also cornered her in the stairwell at the Dealership and attempt to kiss her. The two worst and most unwelcome instances of assault are described in detail below.

16. These sexually-charged comments and offensive and unwelcome conduct by Christodoulou occurred on a daily basis, even though Dianne repeatedly told Christodoulou that she was not interested in a sexual relationship with him and begged him to leave her alone.

### The October 2004 Sexual Assault

17. On or about October 20, 2004, Christodoulou asked Dianne to work late. He told Dianne that he needed a receptionist to answer phones, give directions, and greet people for a party being conducted in the Porsche showroom for a motor club.

18. At about 6:00 p.m., Christodoulou asked Dianne to accompany him to other floors of the building. Dianne protested, telling Christodoulou that she could not leave her desk. Christodoulou told Dianne to leave her workstation and go with him. Christodoulou took her up the passenger elevator and showed her the cars on each floor. When Dianne and Christodoulou got to the roof, Christodoulou identified a new Rolls-Royce Phantom and asked Dianne if she would like to sit inside it. Dianne said that she "didn't want to mess anything up." Christodoulou opened the door and told Dianne to sit in the passenger seat.

19. Christodoulou entered the car and immediately thrust his tongue in Dianne's mouth. Dianne attempted to push Christodoulou off but Christodoulou overpowered her. He

stopped kissing her briefly and then began again. Dianne again attempted to push Christodoulou off of her and managed to escape from his grip. Dianne stated to Christodoulou "I'm not like this. I don't do this." Christodoulou told her to fix her lipstick and that she should take the stairs downstairs while he took the elevator so nobody would see them together.

### Christodoulou's Unwanted Sexual Advances Continue

20. The next day, on or about October 21, 2004, Christodoulou touched Dianne's legs and told her "you have such sexy legs…you're killing me. I'd love to take you upstairs and rape you." Dianne made clear to Christodoulou that his conduct was unwelcome and offensive.

21. Christodoulou warned Dianne not to complain to anyone about him, especially Brian Miller ("Miller"), the owner of the Dealership, because if she did, she would be fired. Christodoulou told Dianne about another woman who had complained to Miller about sexual harassment and had been fired soon afterwards. Nevertheless, that same day, Dianne complained to Lenka Strnadova, a Porsche service writer, about Christodoulou.

22. Notwithstanding her rejection of his advances, Christodoulou continued to sexually harass Dianne by constantly making lewd sexual comments towards her and touching her inappropriately. He repeatedly asked Dianne to go out on a date with him. Christodoulou also told Dianne about his girlfriend, Francesca, and told Dianne that he brought home women to have sex with him and Francesca.

23. In November 2004, Dianne met with Christodoulou outside of the workplace in order to reiterate to him that his sexual conduct was unwelcome and harmful to her. At an informal dinner, Dianne told Christodoulou that she was concerned about keeping her job, which was very important to her. But she repeated to Christodoulou that she did not want a sexual relationship with him, and asked him again to leave her alone.

24.  Dianne reminded him that he was married and that they had to work together on a daily basis. Dianne also explained to Christodoulou that that her family was struggling financially; her ex-husband had congestive heart failure and her daughter was working as hostess to contribute towards her college tuition.

25.  Notwithstanding Dianne's complaints to him, Christodoulou continued to sexually harass her and his conduct even escalated in frequency. He told Dianne that he had made dinner reservations for them for the following Thursday. When Dianne declined the offer, Christodoulou told Dianne she should "think it over."

26.  The following Thursday, Christodoulou appeared at work dressed up and told Dianne that he had driven his Bentley to work so he and Dianne could go out that night. Dianne again declined the invitation. Christodoulou insisted that Dianne still think about his dinner offer, but Dianne never agreed to go out with him.

27.  One week later, Christodoulou asked Dianne to dinner again. Dianne again declined. Christodoulou became angry and told Dianne he would now have to go with Francesca, his girlfriend, and that he did not want to.

28.  Christodoulou's anger at Dianne continued, along with his sexual harassment of her, including continued explicit sexual comments towards her. At other times, he would yell at her. On one occasion, Christodoulou screamed at Dianne because she had paged him to inform him that a customer was waiting for him: "I told you not to fucking page me. I don't care about these customers. They can fucking wait."

29.  On or about Christmas 2005, the Dealership gave Dianne a $250 holiday bonus to reward her for her good work in the few months she had been there.

## The January 2005 Sexual Assault

30. On or about January 15, 2005, there was a presentation of the new Porsche Boxter, and Miller, the owner of the Dealership, asked Dianne to work late that evening. Christodoulou told Dianne that he had customers arriving at 5:30 p.m. and also asked Dianne to work late. Dianne agreed to work late, believing that Christodoulou would not harass her due to the presence of others at the Porsche event and the small window of time between when the rest of the Dealership staff left work and the scheduled time of the customers' arrival.

31. At about 5:00 p.m., all of the staff left the Dealership except Christodoulou. Christodoulou asked Dianne to go to Miller's office because he needed to show her something located there. After Dianne entered Miller's office, Christodoulou sexually assaulted her. He started kissing her and attempted to unbutton her suit jacket. Dianne's jacket had rhinestone buttons which made it difficult for Christodoulou to move out of the button holes. Frustrated, Christodoulou pulled Dianne's suit and bra up and to the side, exposing her right breast. Christodoulou put his mouth on Dianne's nipple with force as she attempted to escape his grip. In pain, Dianne finally managed to pull away and sat on Miller's couch.

32. The phone rang in Miller's office, and Dianne urged Christodoulou to answer it, believing the call to be from the customers scheduled to arrive at 5:30 p.m. Dianne also believed that if Christodoulou answered the phone, she would be able to leave the office. Christodoulou refused, and stood in front of Dianne and pulled his pants and underwear down, exposing his uncircumcised penis. Christodoulou asked Dianne if he could "put it in for a minute…just a minute." Dianne said no. Christodoulou responded: "then suck me, and get me hard." He sat down next to Dianne on the couch. Dianne said "no, I won't do this; I told you."

33. Christodoulou then seized Dianne's hand and put it on his penis. Dianne pulled her hand away. The phone rang again, and Dianne told Christodoulou "you'd better get that."

Christodoulou ignored the phone, and Dianne pleaded with him that the customer would be angry. Finally, Christodoulou said "okay, okay, nevermind" and got dressed. The phone rang again and he answered it. Dianne left Miller's office at that time and returned to the reception desk.

### Plaintiff Complains to Management About Christodoulou and Management's Retaliation

34. Due to the severe emotional anguish that resulted from the persistent harassment by Christodoulou, Dianne was unable to report to work for several days in December 2004 and January 2005. In early January, David Delaney ("Delaney"), one of her supervisors and the Service Director at the Dealership, questioned her about her absences, but fearing retribution from Christodoulou, Dianne did not inform Delaney that it was the severe emotional distress resulting from Christodoulou's egregious behavior that was the cause of her having to take sick days.

35. On or about January 17, 2005, Dianne learned that the Dealership was advertising for her job in the newspaper. Dianne thought that Christodoulou had induced the Dealership to fire her for objecting to and complaining about his outrageous conduct.

36. Christodoulou told Dianne that he had received resumes for her job but said: "I'm throwing these in the trash. You owe me big time for saving your job." Dianne understood this to mean that keeping her job meant succumbing to Christodoulou's sexual advances.

37. In an effort to set the record straight about her absences from work but fearing that she would be fired if she complained about Christodoulou's conduct to any of the male members of the Dealership staff, Dianne again confided in Lenka Strnadova on or about January 17, 2005 about both the January 15, 2005 sexual assault and the relentless sexual harassment to which she was being subjected. Strnadova insisted on reporting the matter to Miller.

38. The next day, Strnadova told Miller that Christodoulou was sexually harassing Dianne. Upon information and belief, Miller then told Christodoulou about Dianne's allegations.

39. That day, Christodoulou appeared at Dianne's desk and said "I'm really angry with you. You have a big mouth." After a while, he returned to Dianne's desk and told her that she had never objected to his sexual conduct. Dianne told Christodoulou that she had repeatedly complained to him and told him at the November 2004 dinner to leave her alone. Later in the day, Christodoulou returned to Dianne's desk again and said "Are you still mad at me? You shouldn't be mad at me after everything I've done for you."

40. On January 20, 2005, Dianne complained to Delaney about Christodoulou's conduct. Delaney laughed at Dianne, calling her "little Miss prim and proper" and declared that Dianne's story was "hard to imagine."

41. Dianne also complained to May Medira ("Medira"), Miller's fiancée, who worked in the accounts payable department at the Dealership. Medira told Dianne that Christodoulou had sexually harassed her and touched her inappropriately after she began working at the Dealership, and that Medira reported the conduct to Miller. Miller and Medira then made their relationship public and Christodoulou stopped harassing Medira.

### Dianne is Constructively Discharged

42. Dianne's complaints to Miller via Strnadova, to Christodoulou himself, and to Delaney went unanswered and the Dealership took no remedial action as a result of her complaints. In fact, Delaney told Dianne that he and Miller believed that she and Christodoulou were having a consensual affair.

43. On several prior occasions and on February 11, 2005, Dianne was suffering such severe emotional and physical distress as a result of Christodoulou's conduct that she was unable to report to work.

44. Faced with the untenable "choices" of succumbing to Christodoulou's sexual demands, continuing to work under unendurable conditions, which already had her on the edge of a breakdown, or losing her job, Dianne had no option but to leave the Dealership on February 14, 2005, as a result of having been constructively discharged.

## FIRST CAUSE OF ACTION

### (Title VII – Hostile Work Environment Discrimination Against MMI)

45. Plaintiff repeats and realleges ¶¶ 1-44 of this Complaint as if set forth herein.

46. Plaintiff was at all times MMI's employee as the term is defined under Title VII.

47. By the acts and practices described above, Defendant has created a hostile work environment by permitting repeated acts of severe and pervasive sexual harassment, thereby discriminating against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of Title VII.

48. Defendant knew that its actions constituted unlawful discrimination on the basis of gender or showed reckless disregard for Plaintiff's statutorily protected rights. These violations are willful within the meaning of Title VII.

49. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

## SECOND CAUSE OF ACTION

### (TITLE VII – Retaliation Against MMI)

50. Plaintiff repeats and realleges ¶¶ 1-49 of this Complaint as if set forth herein.

51. Plaintiff was at all times MMI's employee as the term is defined under Title VII.

52. By the acts and practices described above, defendant MMI has retaliated against Plaintiff for her opposition to unlawful employment practices in violation of Title VII.

53. Defendant MMI knew that its actions constituted unlawful retaliation or showed reckless disregard for Plaintiff's statutorily protected rights. These violations are willful within the meaning of Title VII.

54. Plaintiff is now suffering irreparable injury and monetary damage from Defendant's discriminatory conduct and will continue to do so unless and until the Court grants relief.

### THIRD CAUSE OF ACTION

**(City Law – Hostile Work Environment Discrimination Against MMI And Christodoulou)**

55. Plaintiff repeats and realleges ¶¶ 1-54 of this Complaint as if set forth herein.

56. Plaintiff was at all times defendant MMI's employee, and defendant MMI was at all times Plaintiff's employer as that term is defined under the City Law.

57. By the acts and practices described above, Defendant has created a hostile work environment by permitting repeated acts of severe and pervasive sexual harassment, thereby discriminating against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of the City Law.

58. By the acts and practices described above, Defendants have discriminated against Plaintiff in the terms and conditions of her employment on the basis of her gender, in violation of the City Law.

59. Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

60. Plaintiff is now suffering irreparable injury and monetary damage from Defendants' discriminatory conduct and will continue to do so unless and until the Court grants relief.

## FOURTH CAUSE OF ACTION

### (City Law – Retaliation Against MMI And Christodoulou)

61. Plaintiff repeats and realleges ¶¶ 1-60 of this Complaint as if set forth herein.

62. Plaintiff was at all times defendant MMI's employee, and defendant MMI was at all times Plaintiff's employer as that term is defined under the City Law.

63. By the acts and practices described above, Defendants have retaliated against Plaintiff in violation of the City Law.

64. Defendants acted with malice and/or reckless indifference to Plaintiff's statutorily protected rights.

65. Plaintiff is now suffering irreparable injury and monetary damage from Defendants' discriminatory conduct and will continue to do so unless and until the Court grants relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a) declaring the acts and practices complained of herein are in violation of Title VII and the City Law;

(b) enjoining and permanently restraining these violations of Title VII and the City Law;

(c) directing defendant MMI to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing defendant MMI to reinstate Plaintiff to the position she would have occupied but for defendant's unlawful conduct and making her whole for all

earnings she would have received but for defendant's unlawful conduct, including, but not limited to, wages, pension, bonuses, and other lost benefits;

(e) directing Defendants, jointly and severally, to pay an additional amount of no less than $5,000,000 to compensate Plaintiff for the severe emotional distress that Defendants' unlawful conduct has caused Plaintiff in violation of the City Law, and $100,000 to compensate Plaintiff for the severe emotional distress that Defendants' unlawful conduct has caused Plaintiff in violation of Title VII;

(f) directing Defendants, jointly and severally, to pay Plaintiff an additional amount of no less than $10,000,000 as punitive damages in violation of the City Law, and $200,000 as punitive damages in violation of Title VII;

(g) awarding Plaintiff such interest as is allowed by law;

(h) awarding Plaintiff her reasonable attorneys' fees and costs; and

(i) granting such other and further relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, a trial by jury in this action.

Dated: New York, New York
June 6, 2007

FRANKFURT KURNIT KLEIN & SELZ, P.C.

By: _____
Edward Hernstadt (EH-9569)
Lia N. Brooks (LB-0618)

488 Madison Avenue
New York, New York 10022
(212) 826-5582
*Attorneys for Plaintiff Dianne Rochenski*